**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-56 (CKK)** |
| **v.** | : | |
| | : | |
| **William Vogel,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant William Vogel to 30 days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

"What was the greatest rock concert I've ever been to? Stop the Steal 2020." That is how Defendant William Vogel, a 28-year old mechanic, described the January 6, 2021 riot at the U.S. Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Vogel pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because (1) Vogel observed clear signs that his entry into the Capitol building would be unlawful (including rioters actively damaging scaffolding and police barriers on Capitol grounds, chanting "take it back," and climbing into the Capitol building through broken windows, a flashbang grenade exploding audibly, and an alarm blaring), but he entered nonetheless; (2) Vogel witnessed other rioters calling for violence and destroying government property at the U.S. Capitol, but nevertheless aligned himself with the mob and began shouting and encouraging other rioters himself; (3) Vogel remained in the Capitol building for nearly 20 minutes despite instructions to leave and was ultimately escorted out of the building by police; (4) Vogel recorded his time at the Capitol grounds and inside the Capitol building and broadcast the footage to social media; and (5) Vogel displayed a lack of remorse post-riot.

Moreover, Vogel's communications in the aftermath of January 6th reflect a stark failure to accept his role in the dangerous events of the day.  The Court must consider that Vogel's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's knowing participation in a riot that succeeded in halting the Congressional certification combined with the defendant's lack of remorse renders a jail sentence both necessary and appropriate in this case.

## II.        Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 50 (Statement of Offense), at ¶¶1-7.

### *Defendant Vogel's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, William Vogel traveled from New York to Washington, D.C. with a friend. Defendant Vogel and his travel companion attended the Stop the Steal rally at the ellipse, then walked to the U.S. Capitol. Vogel wore a tan hooded jacket and a large red foam hat bearing the words, "Make America Great Again."

Vogel approached the Capitol building from the West Lawn. There, he witnessed rioters dragging bicycle rack police barricades out of their way and recorded this on his phone, posting the footage to his social media via Snapchat during the riot.[2] Vogel also witnessed rioters climbing on top of and destroying the scaffolding covering the Northwest stairs, which lead to the Northwest Courtyard, just outside of the Senate Wing Doors. Again, Vogel captured this on video and posted it to Snapchat during the riot. A flashbang grenade can be heard exploding in the vicinity.[3]

---

[2] Exhibit 1: Video posted to Snapchat by Defendant Vogel on January 6, 2021, at 1:15.
[3] *Id.* at 1:25.



*Image 1*                    *Image 2*

*(Screenshots from Exhibit 1 at 1:15 and 1:25– Rioters remove barricades and cause*

*damage at Capitol)*

       Vogel joined the crowd surging through the scaffolding and up the Northwest stairs. At the top of the staircase, Vogel turned around and filmed the surge of rioters coming up the steps and chanting "Whose house? Our house!," among other things. He recorded the many thousands crowding the area surrounding the Capitol.[4] Vogel then turned towards the Capitol building and walked across the Northwest Courtyard to the Senate Wing Door. There, he again took out his phone to record his surroundings. Rioters chanted "take it back" and entered the building through broken windows to the side of the Senate Wing Door.[5]

---

[4] *Id.* at 2:03.
[5] Exhibit 2, Video recorded on Defendant Vogel's cell phone (entering Capitol).



*Image 3*

*(Screenshot from Exhibit 2 –Rioters enter Capitol through broken window)*

As Vogel approached the doorway, a blaring siren was clearly audible as heard in his cell phone video.[6] However, Vogel still entered the building at 2:26 p.m. and continued to record the scene on his phone, before following other rioters down a hallway towards the Crypt.[7]



*Image 4*

*(Screenshot from Exhibit 3 – Vogel after entering Capitol through Senate Wing Door)*

---

[6] *Id.*
[7] Exhibit 3, CCTV of Senate Wing Door, at 2:26pm.

Vogel entered the Crypt as the crowd inside chanted "our house," and the crowd pushed back against a line of police officers across the room. At first, Vogel recorded the chaos on his phone.[8] In another video posted to Snapchat during the riot, Vogel recorded someone shouting, "we have the power" and Vogel replied, "Amen!"[9] However, Vogel soon added his own voice to the mob, cupping his hands to his mouth and shouting, "Let this be a message to the Chinese communists."[10]



*Image 5*

*(Screenshot from Exhibit 5 – Vogel shouts in Crypt)*

While in the Crypt, Vogel also hugged and fist bumped other rioters.[11] At some point, the crowd dissipated, and U.S. Capitol Police officers began to clear the area. As depicted below, Officers directed Vogel to leave the way he came.[12] Officers had secured the Senate Wing Door and were filing rioters back out of the Capitol building through the broken window.[13]  Sergeant J.

---

[8] Exhibit 4, Video recorded on Defendant Vogel's cell phone (Crypt).
[9] Exhibit 1: Video posted to Snapchat by Defendant Vogel on January 6, 2021, at 3:02.
[10] Exhibit 5, Open Source Video from YouTube user "Checkpoint Asia" at 0:41.
[11] Exhibit 6, CCTV of Crypt East, at 2:30pm.
[12] Exhibit 7, CCTV of Crypt South, at 2:36pm.
[13] Exhibit 3, CCTV of Senate Wing Door, at 2:36pm.

McGinniss of the U.S. Capitol Police, who was in the Crypt with Vogel at this time, confirmed that the Officers were instructing rioters to clear the area.[14] However, Vogel remained in the Crypt.



*Image 6*

*(Screenshot from Exhibit 7 – U.S. Capitol Police direct Vogel to exit)*

Vogel spent close to 20 minutes in the Crypt. For a short time, he picked up several pieces of trash and placed them in a garbage bag instead of leaving the Crypt and Capitol building as instructed. He had to be escorted out of the building by U.S. Capitol Police officers, led by Sergeant McGinniss.[15]  Vogel was led out of the Capitol building through the South Door at 2:45 p.m..[16]

---

[14] Exhibit 8, Interview of U.S. Capitol Police Sergeant McGinniss.
[15] Exhibit 8, Interview of U.S. Capitol Police Sergeant McGinniss.
[16] Exhibit 9, CCTV of South Door, at 2:45pm.

However, after being led out of the building, Vogel did not leave Capitol Grounds; he remained for hours. At about 4 p.m., Vogel walked up the East steps of the Capitol building outside of the Rotunda Door, where someone was giving a speech via megaphone.[17] Vogel waved a flag bearing the words "Trump 2020" for several minutes. He remained on the East steps for nearly 30 minutes, before descending and finally vacating Capitol grounds. Vogel admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and that he paraded, picketed, and demonstrated at the U.S. Capitol.

*Post January 6th Conduct*

Vogel's comments on Facebook in the days after January 6th display not only a lack of remorse, but a callous impunity towards his participation in the violent insurrection.  Vogel glorified the events that took place in private messages with Facebook friends, describing it to one person as "epic."[18] He sent links to his footage of the riot to more than 20 contacts.

Vogel's dismissal of any accountability for his participation in the violent mob was perhaps best captured by a conversation with his brother on January 7, 2021. He asked his brother, rhetorically, "what was the best rock concert I've ever been to," and answered himself: "stop the steal 2020."[19] His brother admonished him not to boast, especially considering 5 people died: "Idk what the best show I've ever been to was. But I've never been to one where 4 people died and a woman got shot in the neck by the cops. And I wouldn't brag about it if I was." Vogel responded coolly, "should the cops not have shot her? … watching videos of all this now … [] you should've went to this one."[20]

---

[17] Exhibit 10, CCTV of CVC Elevator Tower North, at 4:18pm; Exhibit 11, Open Source Video, at 1:34:32.
[18] Exhibit 12, Scoped Facebook Data at p. 58.
[19] Exhibit 12 at p. 15.
[20] Exhibit 12 at p. 25-26.

Vogel also minimized his conduct. He claimed that he "simply walked into the lobby of the capital . . . And didn't even film anything crime wise [sic]," when speaking to one person, but failed to mention the police barricades, flash bang grenades, broken windows, building alarms, or police officers instructing rioters to leave.[21] In public Facebook comments, versus the above-mentioned private messages, Vogel denied his participation in the riot outright: "you guys all have some balls saying I was 'involved' in 'domestic terrorism' and reporting me to the FBI, the police, the news … when not only my video has no crimes being committed … but you don't even have evidence IF I was in there. (if) I was there, I would have acted as a journalist."[22]

*Vogel's Post-arrest Interview with the FBI*

On January 26, 2021, Vogel gave a voluntary post-arrest interview to the FBI. During the interview, he admitted to understanding that January 6th was the day Congress was certifying the Electoral College vote. He stated he traveled to Washington with his friend because Trump tweeted that it would be crazy and because he thought it was "going to be a good time."

With regards to his behavior at the Capitol, Vogel was initially unwilling to admit his involvement in the riot: "If I was there, I was just trying to capture anyone who may commit a crime…I would have intervened if someone did something." After the FBI informed him that video evidence definitively placed him inside the Capitol, Vogel admitted that he "saw a crime," "broken glass," and had "video of people moving barriers." However, he maintained that he "was trying to film criminal activity." He did not claim to have press access or privileges. He did not admit to chanting in the Capitol building or remaining despite orders to leave.

---

[21] Exhibit 12 at p. 58.

[22] Exhibit 13, Screenshots of Vogel's comments on Facebook. The Government has seen no evidence that Vogel is a member of the news media.

*The Charges and Plea Agreement*

On January 25, 2021, the United States charged Vogel by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On January 26, 2021, law enforcement officers arrested him at a residence in Pawling, New York. On January 27, 2021, the United States charged Vogel by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On February 1, 2023, pursuant to a plea agreement, Vogel pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Vogel now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration and 3 years' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Vogel's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Notably, for a misdemeanor defendant like Vogel, the absence of violent or destructive acts is not a mitigating factor. Had Vogel engaged in such conduct, he would have faced additional criminal charges. Defendant's presence and participation on January 6 cannot be rendered insignificant by comparison to other, more violent members of the mob – as with all of the rioters who broke into the Capitol that day, Vogel's "presence was part of the floodwaters that drowned the Capitol in insurrection and destruction." (Statement of Judge Kollar-Kotelly, *United States v. Danean MacAndrew,* 21-cr-730 Tr. 1/17/2023 at 17).[23]

Of the most important factors in Vogel's case are all the actions he took after willfully ignoring warning signs and police orders. First, Vogel entered the Capitol building despite observing clear signs before entering that his presence was unlawful, including rioters damaging scaffolding and police barriers on Capitol grounds, chanting "take it back," and climbing into the Capitol building through broken windows, a flashbang grenade exploding audibly, and an alarm blaring. Then, despite seeing a crowd push back against a line of police officers in the Crypt, Vogel engaged in behavior to further incite other rioters (e.g., chanting and shouting) and to encourage

---

[23]  Defendant's brief detour to pick up garbage in the Capitol is likewise not a mitigating circumstance. Most likely, finding himself outnumbered by Capitol police for the first time that day, Vogel acted in self-preservation, attempting to separate himself from the riot he was gladly participating in minutes earlier, to elicit favorable treatment from the police. At its very best, this momentary disengagement from the riot would not negate the havoc in which he had just participated.

other rioters (e.g., hugging and fist bumping other rioters). Next, significantly, as made clear by video evidence and confirmed by at least one Officer who was present in the Crypt with Vogel, despite being instructed by officers to leave, Vogel *defied* the orders he was given and remained in the Crypt and Capitol building for several minutes after being told to leave. Others *did* leave. As CCTV footage shows, Vogel could have filed out of the Crypt, back down the hallway through which he entered, and out onto the Northwest Plaza with dozens of other rioters. But he did not. He remained in the Crypt in stark violation of clear instructions from the U.S. Capitol Police.[24] Vogel remained in the Crypt long enough that USCP Sergeant McGinniss had to personally escort him out of the building. And finally, even then, Vogel did not return home, but walked around to the East side of the Capitol where he continued to unlawfully demonstrate on Capitol grounds. Furthermore, Vogel recorded and posted to social media much of the chaos and violence he observed, celebrating the mayhem of the riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Vogel

Vogel's history is unremarkable. As set forth in the PSR, William Vogel's criminal history consists of two traffic infractions. See ECF 55 (Presentence Investigation Report). Vogel advised the author of the PSR that he has been employed as a mechanic since 2015. Nothing about Vogel's history or personal circumstances mitigates his conduct on January 6, 2021.

---

[24] Only after Vogel had already spent at least 15 minutes in the Capitol building did he pause to momentarily pick up garbage.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Vogel's words in the aftermath of the insurrection not only glorified the destruction he and the other rioters wrought, but evidence a callous disregard for the consequences of his actions. It is deeply concerning that anyone would refer to the events of January 6th, where police officers and civilians alike were injured or killed, as "the greatest rock concert." Even after his brother, to whom he said those words, pointed out the violence and loss of life that resulted from the riot, Vogel doubled down: "you should've went to this one."

Elsewhere, Vogel vacillated between boasting about his participation or denying it outright whenever it suited him. When speaking to friends in private messages, he sent links to his videos and described the day as "epic." However, in public messages, he suggested there was no evidence

of his participation in the riot, and claimed he would have been a journalist if he was in fact at the Capitol that day. Vogel's apparent lack of remorse suggests a strong need for specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[25] This Court must sentence Vogel based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Vogel has pleaded guilty to Count 4 of the Information, charging him with Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than

---

[25] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of

minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom.

*See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who entered the Capitol from the violent West side of the building despite witnessing clear signs that their entry was unlawful, ignored orders from police officers, and showed a lack of remorse following the events of January 6, 2021. A defendant who witnessed the significant violence on the West side of the Capitol, and later ignored instructions from police officers to leave the Capitol, took additional steps to occupy the Capitol and displace Congress. They were provided opportunities to reconsider their course of behavior, but nevertheless chose to partake in the disruption of the day, repeatedly.

One such defendant was Phillip Weisbecker. *See United States v. Phillip Weisbecker,* 21-cr-682 (TFH). Like Vogel, Weisbecker approached the Capitol from its West side, where he witnessed rioters climbing the scaffolding as law enforcement deployed tear gas to try and disperse the rioters. Like Vogel, Weisbecker also entered the Capitol about 15 minutes after it was first

breached, through the Senate Wing Door, where other rioters were climbing in through broken windows. Moreover, Weisbecker shared photos and videos of the chaos occurring at the Capitol on social media, but nevertheless claimed that he was merely protesting peacefully.

Despite Weisbecker's suggestion that his nonviolence at the Capitol was a mitigating factor, Judge Hogan sentenced him to 24 months of probation, with 30 days of intermittent incarceration as a condition of probation, on one count of 40 U.S.C. § 5104(e)(2)(G). Judge Hogan emphasized that the riot in which defendant participated, as depicted in defendant's own shared media, was not peaceful. Moreover, defendant's statements after the insurrection evidenced a lack of remorse. Vogel, too, shared videos of violent scenes at the Capitol on social media, while simultaneously downplaying the violence that occurred, and even glorifying the chaos he participated in. As was the case for Weisbecker, this behavior, coupled with a lack of remorse, warrants a sentence of incarceration.

*United States v. Joshua Wagner*, 21-cr-310 (ABJ), presents another comparable set of facts. Wagner entered the Capitol from the West side and through a window near the Senate Wing Door. Wagner then traveled to the Crypt, where he ignored orders from Police to vacate the building. Instead, Wagner took to calling the police traitors and shouting that the Capitol was, "our house." Judge Berman Jackson sentenced Wagner to 30 days' incarceration on one count of 40 U.S.C. § 5104(e)(2)(G). Vogel entered the Capitol through the same breach point as Wagner, and once inside, traveled to the same location, the Crypt, where he also ignored instructions to leave. Like Wagner, Vogel contributed to the disruption taking place in the Crypt by shouting that he was sending a message and encouraging the other rioters with hugs and fist-bumps.

Lastly, *United States v. Daniel Morrissey*, 21-cr-660 (RBW), is also instructive. Judge Walton sentenced Morrissey to 45 days' incarceration on one count of 40 U.S.C. § 5104(e)(2)(G).

Morrissey chanted in the Capitol and took pictures of what he saw. After the riot, Morrissey sent videos of himself to a coworker on social media in an apparent attempt to boast about his participation. Similarly, Vogel shouted inside the Capitol and recorded the events around him. Like Morrissey, Vogel then disseminated his videos on social media as a manner of glorifying the riot, referring to it as "epic," and "the greatest rock concert" he'd ever been to. Vogel's disruptive actions and lack of remorse here, too, warrant a period of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[26]

---

[26] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally Appellee's Brief for the United States, United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011).[27] Generally, restitution under the VWPA must "be tied to the

loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990);

identify a specific victim who is "directly and proximately harmed as a result of" the offense of

conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with

recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes

a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea

---

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)). In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

[27] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Vogel must pay $500 in restitution, which reflects in part the role Vogel played in the riot on January 6.[28] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Vogel's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 21.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

---

[28] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

By:    s/ *Alexander Diamond*
ALEXANDER M. DIAMOND
NY Bar No. 5684634
Assistant United States Attorney
District of Columbia
601 D St. NW, Room 6.3104
Washington, DC 20530
(202) 506-0427
Alexander.Diamond@usdoj.gov

## CERTIFICATE OF SERVICE

On this 22nd day of May 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

s/ *Alexander Diamond*
ALEXANDER M. DIAMOND
NY Bar No. 5684634
Assistant United States Attorney
District of Columbia
601 D St. NW, Room 6.3104
Washington, DC 20530
(202) 506-0427
Alexander.Diamond@usdoj.gov